```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
UNITED STATES OF AMERICA,           :
                                    :
            -v-                     :    09 Cr. 085 (JSR)
                                    :
MARC DREIER,                        :    MEMORANDUM ORDER
                                    :
            Defendant.              :
------------------------------------ x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/5/10

JED S. RAKOFF, U.S.D.J.

      An under-appreciated evil of substantial frauds like those of Marc Dreier is how they pit their victims against one another. Where, as here, the funds remaining after the fraud is uncovered are insufficient to make whole Dreier's numerous victims and creditors, these unfortunates are left to squabble over who should get what. In this case, moreover, resolution of these competing claims involves consideration of three bodies of law -- criminal law, securities law, and bankruptcy law -- that cannot always be reconciled without some friction.

      For some time now, it has been evident to this Court in presiding over the criminal action against Dreier, and to the judges presiding over the civil enforcement action brought against Dreier by the Securities and Exchange Commission and the bankruptcy proceedings involving the estates of Dreier and his law firm, Dreier LLP, that these inherent tensions are best addressed through coordination and cooperation by all concerned. Accordingly, on April 22, 2009, the three judges convened a joint hearing to urge such a resolution by the affected parties. Eventually, the Government, the Commission (which is no longer directly affected), the bankruptcy trustees, and

various other affected parties reached a global settlement in the form of several proposed agreements and orders, to which others filed objections. On January 12, 2010, Senior District Judge Cedarbaum, Chief Bankruptcy Judge Bernstein, and the undersigned held a joint hearing on the proposed settlement, to which all affected parties were invited to attend and following which the judges received further written submissions. Now, subject only to certain related proposals pending before the Bankruptcy Court, this Court, confirming its Memorandum issued on January 29, 2010, hereby approves the proposed settlement agreements and reconfirms the Court's prior restitution order as well.

The first of the proposed settlement agreements is a "Coordination Agreement" between the Government and the Trustee for the Dreier LLP bankruptcy estate (the "Chapter 11 Trustee"). Under this agreement, the Government will not seek forfeiture of any recoveries generated through avoidance actions brought by the Chapter 11 Trustee, and the Government will release to the Chapter 11 Trustee ninety-seven seized artworks that the Government is presently unable to trace to the proceeds of Dreier's offenses. In return, the Chapter 11 Trustee promises not to contest forfeiture of the properties listed in the schedule to the Court's Preliminary Order of Forfeiture entered July 13, 2009.

Additionally, under the Coordination Agreement, the Chapter 11 Trustee will not challenge the forfeiture of funds disgorged by GSO Capital Partners and its affiliates ("GSO") pursuant to a

proposed consent order (the "GSO Consent Order"). Under the GSO Consent Order, GSO will forfeit to the Government $30,895,027.78 -- an amount representing payments of interest and fees received by GSO facilities in connection with their investments in Dreier's fictitious promissory notes. In exchange for this payment, the Government will forego seeking forfeiture of other GSO facility funds presently under restraint because of their connection to Dreier's note fraud.

In conjunction with the Coordination Agreement and the GSO Consent Order, certain related applications are also pending before the Bankruptcy Court. First, the Chapter 11 Trustee seeks Bankruptcy Court approval of the Coordination Agreement. Second, the Chapter 11 Trustee and the Trustee for Dreier's personal bankruptcy (the "Chapter 7 Trustee") seek Bankruptcy Court approval of agreements with GSO whereby GSO will pay $9,250,000 to the Chapter 11 Trustee and $250,000 to the Chapter 7 Trustee in exchange for the Trustees' promise not to litigate any claims against GSO and the entry of a Bar Order enjoining creditors and other parties in interest from seeking to recover funds from GSO. Although these applications are before the Bankruptcy Court, not this Court, the Coordination Agreement provides that, even if it is approved by this Court, it will not take effect unless the Bankruptcy Court approves the settlement between GSO and the Chapter 11 Trustee.

Also before this Court are stipulations between the Government and the Chapter 7 Trustee (the "Chapter 7 Trustee

Stipulations") regarding the sale of three real properties listed in the Preliminary Order of Forfeiture (two houses in East Quogue and a Manhattan condominium). In exchange for the Chapter 7 Trustee's successful efforts to market and sell these properties, and because the Government previously agreed to release the personalty in these properties to the Chapter 7 Trustee, the Government proposes to release ten percent of the proceeds from the sale of these properties to the Chapter 7 bankruptcy estate.

Finally, before the Court is a proposed stipulation (the "Fortress Stipulation") between the Government and certain facilities managed by Fortress Investment Group LLC and its affiliates ("Fortress"). Because the Fortress facilities lost over $84 million from their investments in Dreier's fictitious notes, the Government does not intend to seek forfeiture of certain note fraud proceeds that were received by these facilities; accordingly, the proposed stipulation would vacate the restraining order that is currently freezing those funds.

While the undersigned has solicited the opinions of Judge Cedarbaum and Chief Bankruptcy Judge Bernstein as to their views of these proposals from the standpoint of securities law and bankruptcy law, this Court must address these proposals, first and foremost, from the standpoint of federal criminal law, especially the provisions of federal criminal law dealing with forfeiture and restitution. Under the restitution provisions, victims of crimes have the right to "full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). This Court "shall ensure" that these and

other victims' rights are vindicated, and the Government has the obligation to "make [its] best efforts" to this end. Id. § 3771(b)(1), (c)(1). Thus, while the related forfeiture provisions provide only that a defendant shall forfeit "to the United States" the fruits of his crime, 21 U.S.C. § 853(a), including so-called "substitute assets" under certain conditions, id. § 853(p), the Government has represented that, consistent with applicable laws and regulations, the assets obtained from the forfeitures in this case will be applied toward victim restitution, see Gov't Letter, 4/22/09, at 10.

In furtherance of these laws, the Court, in the aforementioned Preliminary Order of Forfeiture, ordered preliminary forfeiture to the United States of $746,690,000 in cash held in accounts controlled by Dreier, as well as preliminary forfeiture of specific properties listed in that order. As part of Dreier's sentence, he was also ordered to make an additional restitution payment to his victims in the amount of $387,675,303. Also, on September 29, 2009, the Court entered a Second Amended Restitution Order specifying that if restitution is made in partial payments, those payments are to distributed to the victims on a pro rata basis according to their loss amounts.

The forfeiture laws further authorize the Government to compromise competing claims to forfeited assets. 21 U.S.C. § 853(i)(2); accord In re W.R. Huff Asset Mgmt. Co., 409 F.3d 555, 564 (2d Cir. 2005). Many of the objections to the settlement agreements here under consideration come down to the assertion that the

5

Government should not compromise its claims to certain artwork and other property that, in the objectors' view, belong, indirectly, to the victims. Thus, Fortress and certain other hedge funds (collectively, the "Hedge Funds"), who are by some measures the largest victims of Dreier's frauds (but who were also arguably the recipients of fraud proceeds) assert that the property to be turned over to the Chapter 11 Trustee under the Coordination Agreement is indisputably forfeitable, so its transfer would diminish the pool of assets available for distribution to the victims. In response to the Government's argument that the artwork proposed to be turned over to the Chapter 11 Trustee cannot be traced to the proceeds of Dreier's frauds, the Hedge Funds claim that such property is nevertheless subject to forfeiture as substitute assets. Furthermore, according to these victims, the "consideration" flowing to the Government under the Coordination Agreement -- the Chapter 11 Trustee's promise not to challenge either the forfeiture of the properties specified in the Preliminary Order of Forfeiture or the $30.9 million payment under the GSO Consent Order -- is illusory, as there would be no merit to any such challenge.

Although not without some merit, the Hedge Funds' arguments are ultimately unpersuasive. While the Chapter 11 Trustee's claims to the forfeited assets might ultimately prove defective, they are not so frivolous that their resolution would not result in protracted, costly, internecine litigation that would, at a minimum, have the effect of delaying and diminishing the victims' recoveries. For example, it is unclear whether the Government's interest in

6

substitute assets would relate back to the date of the wrongful acts. See United States v. Parrett, 530 F.3d 422, 430 (6th Cir. 2008) (describing circuit split on this issue).  Thus, to the extent that the Government's interest in such property depends on the application of this "relation back" doctrine, litigation would be far from frivolous and its outcome uncertain.  Concomitantly, the Government's promise to refrain from seeking forfeiture of any avoidance recoveries does not appear to give up anything of value, as the Government has taken the position that it is not entitled to pursue such forfeiture actions, see Transcript, 1/12/10 Joint Hearing ("Tr.") 35, and the Hedge Funds have not identified any authority indicating the contrary.  It follows that one effect of the agreement is to incentivize the Chapter 11 Trustee to go after recoveries the Government could not pursue.  While any such recoveries will go to the creditors of the Chapter 11 estate, many of these are also victims of the fraud.

It may also be noted that the Hedge Funds do not object to either the GSO Consent Order or the Fortress Stipulation insofar as they involve the Government's stipulation that it will not seek additional forfeiture from these parties.  This is, in effect, contrary to their argument that the Government should seek to maximize the amount of assets available for distribution to victims regardless of other equitable considerations.  It is hence evident that the Hedge Funds' objections to the Coordination Agreement prove too much, as they are unwilling to carry such objections to their

7

logical conclusions when doing so might adversely affect their own interests.

The other objections stated by the Hedge Funds are similarly unpersuasive. For example, at the joint hearing on January 12, 2010, counsel for Eton Park Capital Management, L.P., one of the Hedge Funds, complained that the proposed settlement was reached without adequate input from some or all of the Hedge Funds. See Tr. 45-46. When pressed, however, counsel was unable to make a specific application to the Court apart from requesting that approval of the Coordination Agreement be delayed until more "information" was provided regarding how the victims would be treated. Id. at 46. Similar process-based objections were advanced by Fortress at the joint hearing and by the Hedge Funds in written submissions.

Although the Government is obligated to confer with the victims before compromising claims, see 18 U.S.C. § 3771(a)(4)-(5), "[n]othing in the [Crime Victims' Rights Act] requires the Government to seek approval from crime victims before negotiating or entering into a settlement agreement." W.R. Huff Asset Mgmt. Co., 409 F.3d at 564. The Court accepts the Government's representation, not directly disputed by the Hedge Funds, that opportunities to confer were early offered to the Hedge Funds, who failed to take advantage of the offer, Tr. 47. Moreover, as a result of the joint hearings in this matter, the Hedge Funds were aware at least as early as April 22, 2009 that settlement negotiations between the Government and the trustees were actively ongoing, and they could have sought to be heard by the Government at any time in the process.

The Court is driven to the conclusion that the real reason for the Hedge Funds' objections to the settlement is their recognition that, even though they were victims of Dreier's frauds, they were also the seeming recipients of fraud proceeds, and hence the bankruptcy creditors (including other victims) may have claims against the Hedge Funds in the form of so-called avoidance actions that, as a result of the proposed settlement, the Chapter 11 Trustee will be free to pursue without any fear that any recoveries will revert to the United States. This is hardly a reason for rejecting the settlement. Whatever the merits of the hypothesized avoidance actions, they will only serve to more perfectly resolve the relative rights of victims and creditors in accordance with the laws of the United States.

Thus, despite the foregoing objections, the Court finds that the Coordination Agreement is reasonable and in the best interests of the victims collectively. As there appears to be no objection before this Court to the GSO Consent Order, which will make $30.9 million available for victim restitution, the Court approves that agreement as well.[1] As to the Chapter 7 Trustee stipulations, although the Hedge Funds object to the payment of ten percent of real property proceeds to the Chapter 7 Trustee, this objection strikes the Court as yet another manifestation of their concern about funding the bankruptcy trustees' litigation efforts, which the Court finds

---

[1] Insofar as there are objections to the Bar Order's preclusion of victim or creditor actions against GSO, see Tr. 11, such objections are to be addressed by the Bankruptcy Court in the first instance.

unpersuasive for the reasons noted above. Because this amount is fair compensation for the Chapter 7 Trustee's sale of these properties and his entitlement to the personalty therein, the Court approves these stipulations. Finally, as there is no objection to the Fortress Stipulation, and because the Government's policy of eschewing forfeiture from "net losers" makes sense, the Court approves that stipulation as well.

The final matter to be resolved is the motion of an individual victim, Paul Gardi, to modify the Second Amended Restitution Order's scheme of <u>pro rata</u> distribution in order to provide Gardi with special priority. Gardi alleges that Dreier, who was Gardi's lawyer, forged Gardi's signature to a settlement agreement between JANA (a hedge fund) and a company controlled by Gardi, and then arranged for JANA to wire the settlement funds, in the amount of $6.3 million, into a trust account controlled by Dreier, who then used the funds for himself. Gardi claims that he is entitled to priority over other victims because he is an individual as opposed to an institutional investor, because the theft of his settlement funds is different in nature from the note fraud losses experienced by the Hedge Funds, and because the relative economic impact of Gardi's losses is more substantial than the impact on institutional victims.

Several affected parties have responded by arguing, among other things, that Gardi's motion to amend the Second Amended Restitution Order is untimely or otherwise procedurally improper; that Gardi was not the only individual victim harmed by Dreier's

10

misappropriation or other misuse of escrowed funds; that Gardi's loss should not be considered to have been suffered by an individual, since the settlement was with his company; that Gardi's financial sophistication is not unlike that of an institutional investor; that JANA, rather than Gardi, was the true victim of this particular fraud; and that there is no principled basis for treating Gardi's loss as different in kind from the losses experienced by Dreier's other victims. The Government has taken the position that a _pro rata_ share is appropriate because "no victim is any more or less deserving here of the restitution." Tr. 16. Finally, in an intermediate position, the representative of the bankruptcy estates of 360networks (USA) Inc. and its affiliates (the "360networks Representative") has submitted a response identifying the 360networks estates as similarly situated to Gardi in that they were victims of theft by Dreier in his capacity as their lawyer, and urges the Court to distinguish between "client" victims and "note fraud" victims by providing client victims with priority.

The Court will assume _arguendo_ that the procedural objection to Gardi's submissions would ultimately not prevail and will instead proceed to the underlying merits. There is nothing _per se_ unfair about a _pro rata_ distribution; the Second Circuit has endorsed this approach as particularly appropriate for frauds like Dreier's involving a Ponzi scheme or the commingling of similarly situated victims' assets. See _SEC v. Credit Bancorp Inc._, 290 F.3d 80, 88-89 (2d Cir. 2002). It is clear from the responses that Gardi is not the only "client" victim of Dreier's frauds or to whom Dreier owed

11

fiduciary duties, and each case doubtless has its own nuances. Additionally, the "note fraud" victims are only immediately the Hedge Funds; it is the investors in these funds, including individuals, charitable and educational institutions, and many others who are the ultimate "note fraud" victims. The truth is that a fraud as large and egregious as Dreier's is like an earthquake that savages its victims at random and is followed by a series of aftershocks that destroys still further assets. Any alternative to the pro rata approach would entail a costly and extensive inquiry into the circumstances of each victim's loss, which would likely devolve into a war of recriminations, to the detriment of all concerned. Accordingly, the Court denies Gardi's motion and confirms the pro rata distribution scheme set forth in the Second Amended Restitution Order.

For the foregoing reasons, the Court hereby reaffirms its Memorandum of January 29, 2010 and approves the Coordination Agreement, the GSO Consent Order, the Chapter 7 Trustee Stipulations, and the Fortress Stipulation. The Clerk of the Court is directed to close the entries numbered 102 and 106 on the docket of this case.[2]

---

[2] Still pending before the Court are three petitions filed pursuant to 21 U.S.C. § 853(n) for ancillary hearings to determine third party interests in property subject to forfeiture. Motion practice is underway with respect to the Government's motion to dismiss the petition filed by the 360networks Representative. Also, the Hedge Funds, in a series of letters submitted to the relevant Courts and the Government, set forth several arguments why the petition filed by Heathfield Capital Limited ("Heathfield") should be dismissed. While these arguments will be considered if and when the Court reaches the merits of the Heathfield petition, they provide no reason to defer approval of the settlement agreements discussed herein.

12

SO ORDERED.

Dated: New York, NY
       February 5, 2010

_____
JED S. RAKOFF, U.S.D.J.

13