

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,            :
                                     :    09 Cr. 085 (JSR)
          -v-                        :
                                     :    OPINION & ORDER
MARC DREIER,                         :
                                     :
     Defendant.                      :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

Fraud is the dysentery of crime: even after the infection is contained, the unpleasant after-effects linger interminably. Thus it is that even after a confidence man has been convicted, the victims of his fraud are often reduced to fighting among themselves over what assets remain.

In this case, the remaining assets in question are fifteen works of art by such well-known artists as Andy Warhol, Mark Rothko, and Roy Lichtenstein (the "Artwork"), collectively worth roughly $33 million, which were once owned by the convicted swindler Marc Dreier and then forfeited to the Government pursuant to this Court's Preliminary Order of Forfeiture. Now pending before the Court is a petition filed by Heathfield Capital Limited ("Heathfield"), successor-in-interest to Elliot International L.P. and Elliot Associates, L.P. (collectively, "Elliot") -- the last and largest victims of Dreier's fraud -- seeking to satisfy a security interest in the Artwork. If granted, the petition would deliver the Artwork to Heathfield alone, removing the Artwork from the pool of assets

1

available to satisfy the restitution claims of Dreier's victims in general.

The Government does not oppose the petition, and has submitted a proposed stipulation and order providing for the Artwork to be turned over to Heathfield in exchange for a $1.65 million fee due to Dreier under the security agreement. Certain other institutional victims of Dreier's fraud, however, styling themselves the "Victim Group," oppose the petition and the proposed settlement, arguing that the security interest is suspect.[1]

On November 30, 2012, after receiving written submissions from Heathfield, the Government, and the Victim Group, this Court held an evidentiary hearing to determine whether there was a factual basis for the proposed settlement. Although neither the Victim Group nor its constituent members were formal parties to this ancillary proceeding, the Court permitted the Victim Group not only to make written submissions, but also to put questions to witnesses at the hearing. But now, having fully considered the entire record, the Court, for the following reasons, grants the petition and approves the settlement.

---

[1] The Victim Group consists of the following parties, all of which are formally identified by the Government as "victims" of Dreier's crimes under 18 U.S.C. § 3771(e): Steven J. Reisman, as Postconfirmation Representative of the Chapter 11 estates of 360networks (USA) Inc. and its affiliates; Concordia Advisors LLC; Enterprise Fund Limited; Concordia MAC29; Concordia Partners L.P.; Concordia Institutional Multi-Strategy Fund, Ltd.; FCOF UL Investments LLC; Fortress Credit Opportunities I LP; Fortress Credit Corporation; and Meyer Venture Partners, L.P.

The Court finds the pertinent facts to be the following. Elliot acquired a security interest in the Artwork as part of a series of transactions in which it purchased a set of promissory notes that Dreier represented had been issued by the Solow Realty and Development Company ("Solow Realty") to four small hedge funds. In truth, however, the entire set-up was a sham concocted by Dreier. The notes -- for which Elliot paid approximately $100 million -- were forged; Solow Realty had never issued them; and the "hedge funds" purporting to sell them were fictitious. Dreier's overall, massive fraud, of which this was just one part (although the largest part), was discovered just a few weeks after the transactions closed.

The senior portfolio manager who oversaw these transactions for Elliot, Charles MacDonald, was the principal witness at the November 30 hearing before this Court. Tr. 4, 6-7. MacDonald testified that, in October 2008, Dreier approached Elliot with what Dreier described as a lucrative opportunity to purchase Solow Realty promissory notes at a substantial discount. Tr. 6-7. Dreier purported to represent several small hedge funds that had initially purchased the notes from Solow Realty and were looking to sell them on the secondary market in order to raise liquidity. Tr. 12.

Although totally a sham, there was nothing facially suspect about this proposal. Dreier at the time was a well-respected attorney with impeccable credentials who headed a large law firm, Tr. 19; the Solow real estate group, of which the issuer of the

3

notes was a part, was a successful and well-known concern that Dreier had at times represented, Tr. 19; and the exploding financial crisis had frozen traditional capital markets, rendering it entirely plausible that a group of hedge funds might want to liquidate assets at a discount to raise cash, Tr. 17.

After receiving this proposal, MacDonald and his team undertook "due diligence," and in so doing, identified two main areas of concern: the financial health of the issuer of the notes and the financial health of the sellers of the notes. Tr. 7. As to the first issue, MacDonald and his team found that, although the Solow group as a whole appeared to be financially sound, the purported issuer, Solow Realty, had few restrictions on its ability to borrow or transfer assets. Tr. 7-8. MacDonald's team accordingly sought ways to protect against a situation in which, in MacDonald's words, "Solow Corp. was doing great but this particular entity had been stripped of assets or loaded to the gills with debt." Tr. 8.

To allay this concern, Elliot made proposals to place various restrictions on Solow Realty's ability to divest itself of assets. Elliot's portfolio manager and negotiator, Sundar Srinavasan, a subordinate of MacDonald's, discussed these proposals with Dreier and a likely imposter pretending to be Steve Cherniak, CFO of Solow Realty; but the idea appeared unworkable because of various complexities in the larger Solow group. Tr. 9-10. Eventually, a suggestion was floated to have Sheldon Solow, the wealthy principal of the Solow group, personally guarantee the notes, obviating the

4

need for any restrictions on the issuer. Tr. 10. Dreier initially indicated that Mr. Solow was unlikely to agree to that proposal, but later reported that Mr. Solow was amenable so long as Elliot would consider rolling the notes over on an annual basis, thus helping the Solow group maintain liquidity. Tr. 43-44. Dreier also indicated that Mr. Solow was anxious to avoid having the notes sold at a discount in a public auction, as that might start rumors around Wall Street about the Solow group's financial health. Tr. 13-15.

As to the second area of concern, MacDonald's team sought to satisfy itself that the hedge funds that were selling the notes were not themselves insolvent or about to become insolvent, since insolvency might expose Elliot to fraudulent conveyance claims or similar litigation by the sellers' creditors. Tr. 11. MacDonald's team initially reviewed the financial information about the sellers provided by Dreier, and one member of the team, analyst Lee Grinberg, who also testified at the November 30 hearing, spoke with an individual purporting to be an employee of one of the sellers. Tr. 39. MacDonald's team also requested additional information about the sellers from Dreier, but Dreier resisted, explaining that, as small hedge funds, the sellers were competitors of Elliot's and were accordingly unwilling to hand over detailed financial documents that would reveal their trading strategies. Tr. 11-12. Dreier explained, however, that he had been familiar with the sellers for years by virtue of their long participation in the Solow notes

5

program, which Dreier helped manage, and assured Elliot that the sellers were in sound condition. Tr. 11-12.

Nevertheless, Elliot was not entirely satisfied. To break this impasse, Dreier eventually came forward with a proposal whereby he would personally vouch for the sellers and would pledge his personal art collection as security. In MacDonald's words, Dreier offered to "put [his] money where [his] mouth is." Tr. 12. After members of MacDonald's team reviewed invoices showing that Dreier in fact owned the Artwork, performed a lien search, and inspected the Artwork firsthand in Dreier's apartment, Elliot accepted. Tr. 16-17, 48-49. In exchange for the security interest, the parties agreed that Dreier would receive a $1.65 million fee, payable upon the earliest of payment on the notes, payment on Mr. Solow's personal guarantee, or delivery of the Artwork to Elliot upon a foreclosure under the security agreement. Pet., ex. B, at 1.

During the due diligence process, MacDonald and his team also considered the fact that Dreier represented multiple parties and played multiple roles in the transactions. Dreier, after all, was counsel for both the issuer and the sellers of the notes, pledgor of security, and the principal of the law firm providing the only legal opinion on the transaction. Based on those multiple roles, MacDonald was concerned that Dreier might be laboring under a conflict of interest, which might impair the reliability of his legal opinion or might lead him, in his zeal to see the transaction proceed, to conceal negative information about the sellers. Tr. 36-

6

37. Srinivasan in particular expressed concern that "something -- he couldn't quite put his finger on it, but . . . something didn't seem quite right about Mr. Dreier's multiple [roles] in the situation." Tr. 20.[2]

MacDonald testified, however, that Dreier's multiple roles were of less concern in light of his longstanding management of the Solow notes program. In that context, MacDonald found it reasonable that a number of hedge funds looking to sell Solow notes on the secondary market would turn to Dreier for help. Tr. 20. In addition, both MacDonald and Grinberg had spoken at length with representatives of Fortress, a longtime participant in the Solow notes program (and now a member of the Victim Group), who stated that Fortress had "been in the notes for years and everything worked perfectly, and they'd always been on time. There was never an issue. They were perfectly happy. Their investment was a comfort to us." Tr. 16; see also Tr. 41-42. Moreover, Dreier would be handsomely compensated for his grant of the security interest, which also solved a seemingly intractable problem and allowed an important deal for a longtime client to go forward. Tr. 12-13. In the end, MacDonald decided that while Dreier's multiple roles might pose some increased legal and business risk, Dreier's actions were sufficiently understandable to allow Elliott to go through with the transactions.

---

[2] In a typographical error, the transcript refers to Dreier's multiple "loans" in the situation.

7

The transactions encompassing the purchase of three notes, Mr. Solow's personal guarantee, and the grant of the security agreement closed on October 24, 2008. A second purchase of an additional note that Dreier had previously indicated might later become available closed on November 6, 2008. In total, the notes had a purported face value of approximately $110 million, for which Elliot paid Dreier, as purported agent for the hedge funds, approximately $100 million.

A few weeks later, Srinivasan attempted to send an email to Mr. Cherniak at his Solow Realty email address, but the email was returned as undeliverable. Tr. 49-50. Srinivasan's attempts to follow up on that email eventually revealed Dreier's fraud. Tr. 50-51.

Dreier later was indicted and pled guilty to a massive series of frauds, of which this was part. On July 13, 2009, this Court sentenced Dreier to 20 years' imprisonment and ordered him to pay roughly $388 million in restitution. On July 17, 2009, the Court issued a Preliminary Order of Forfeiture covering $750,000 in cash and certain specified pieces of property, including the Artwork. In a series of amended restitution orders, the Court later increased the ordered restitution to just under $390 million, with partial payments to be distributed on a pro rata basis in accordance with the amount of each victim's respective loss. On September 11, 2009, Heathfield filed the instant petition, asserting a third-party interest in the Artwork under 21 U.S.C. § 853(n)(6).

Section 853(n)(6) provides that where a sentencing court "determines that [a] petitioner has established by a preponderance of the evidence that . . . (B) the petitioner is a bona fide purchaser for value of [a] right, title, or interest in [given] property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture," the court "shall amend the order of forfeiture in accordance with its determination." This provision derives from common-law rules protecting innocent purchasers, which "developed over time to promote finality in commercial transactions and thus to encourage purchases and foster commerce." United States v. Lavin, 942 F.2d 177, 186 (3d Cir. 1991). The Victim Group argues that Heathfield fails to meet the requirements of this provision for four reasons: (1) when it acquired the security interest, Elliot was not "without reasonable cause to believe" that the Artwork was subject to forfeiture, (2) Elliot failed to acquire a valid security interest, (3) Elliot did not give "value" for the security interest, and (4) the grant of the security interest should be set aside as a fraudulent conveyance under state law. The Court addresses these arguments in turn.

The Victim Group first argues that Elliot was not "reasonably without cause to believe" that the Artwork was subject to forfeiture because it ignored various "red flags" that should have alerted a

9

reasonable person that a fraud was afoot.[3] The test for whether Elliot was reasonably on notice of Dreier's fraud "is an objective[] rather than subjective[] one and examines 'not merely whether the petitioner had knowledge of the forfeitability of the asset but whether the petitioner reasonably held the belief that the property was not subject to forfeiture.'" United States v. King, No. 10 Cr. 122 (JGK), 2012 WL 2261117, at *8 (S.D.N.Y. June 18, 2012) (quoting United States v. Reckmeyer, 836 F.2d 200, 204 (4th Cir. 1987)). In appropriate circumstances, this objective test requires a petitioner "to conduct further inquiry before seeking to obtain an interest" in property that may be subject to forfeiture. Id. at *9; see also United States v. Medina Cuartes, 155 F. Supp. 2d 1338, 1343 (S.D. Fla. 2001) (holding that Section 853(n)(6)(B) proscribes "'willful blindness' on the part of a petitioner and imposes a duty of reasonable inquiry, where warranted").

In its post-hearing submission, the Victim Group points to three supposed "red flags" that Elliot ignored when it acquired the security interest from Dreier. First, Dreier represented to Elliot that the sellers, none of whom MacDonald or Grinberg was familiar with, were unwilling to provide detailed financial statements to Elliot, statements MacDonald and his team deemed critical to

---

[3] The parties agree that, although the statute requires "the petitioner" to be "reasonably without cause to believe" that the property was subject to forfeiture, 21 U.S.C. § 853(n)(6)(B), Heathfield, as Elliot's successor-in-interest, stands in Elliot's shoes, and therefore the relevant inquiry here concerns Elliot's reasonableness.

10

addressing one of their two main concerns during the due diligence process. Second, Dreier represented multiple parties with differing interests and also played multiple roles in the transaction, aspects that MacDonald testified were a concern "throughout the entire due diligence process," Tr. 22, and that caused Srinivasan to harbor doubts about Dreier's multiple roles up to the very end, Tr. 19-20. Third, Dreier was so eager to see the transaction close that, even though he had previously only participated in the negotiations as an attorney, he offered to pledge his personal art collection as security, a feature that both MacDonald and Grinberg testified was highly unusual; indeed, Elliot had never before taken collateral in the form of artwork. Tr. 14, 44, 46. Based on these "badges of fraud," In re Sharp Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005), the Victim Group contends that "Heathfield has failed to meet its burden." Victim Group Letter Br. at 6.

It must be noted, as an initial matter, that the Victim Group misconceives the question presented. Because the Government does not oppose Heathfield's petition and has submitted a proposed settlement, the issue for decision is not, as the Victim Group asserts, whether Heathfield has met its burden of proof, but rather whether there is an adequate factual basis for the settlement. Nevertheless, here, as elsewhere, the Court has permitted the Victim Group to proceed as if it were an adversary party in the proceeding now sought to be resolved; but even on this assumption, the Court has no difficulty in concluding that Heathfield was "without

11

reasonable cause to believe" that the Artwork was subject to forfeiture, as Section 853(n)(6)(B) requires.

Turning first to the sellers' reported unwillingness to turn over detailed financial statements, the Court finds nothing that should have raised alarms, given that Dreier represented to Elliot that the sellers were fellow small hedge funds, who would be understandably reluctant to open their books to a competitor. The Victim Group objects that MacDonald and his team could not possibly have believed that the hedge funds were competitors of Elliot, because the hedge funds did not exist. But that argument is circular -- the very question at issue is whether Elliot had reason to know that the transaction was a fraud and the hedge funds were fictitious. Dreier's story about the hedge funds was internally consistent and facially legitimate. Moreover, Grinberg actually spoke to an individual who purported to work for one of the hedge funds, giving Elliot even less reason to doubt that the sellers were real.

Furthermore, the transaction had many other trappings of legitimacy. Dreier was then a well-known and well-respected attorney; Solow Realty had a well-known notes program, which Dreier had helped manage for years; an individual purporting to be Mr. Cherniak, CFO of Solow Realty, had confirmed that the notes were genuine and up for sale; representatives for Fortress, a large hedge fund that is now a member of the Victim Group, had vouched for smooth operation of the Solow notes program; and finally, it made

sense at the height of the financial crisis that a group of hedge funds might be looking to sell assets to raise liquidity. In that context, Elliot reasonably interpreted the sellers' reluctance to share information as a symptom of hedge funds' customary protectiveness of their privacy, and not as a sign that the entities had been invented out of whole cloth by Dreier.

As to Dreier's multiple roles in the transaction (a not unusual situation in real-estate-related "deals"), MacDonald testified that his team carefully considered that factor throughout the due diligence process. In their investigation, MacDonald and his team found that, by virtue of his role in the Solow notes program, Dreier had developed relationships with many note purchasers, making it unsurprising that when a group of note purchasers purportedly wanted to sell notes on the secondary market, they might turn to Dreier. MacDonald and his team had sensible concerns that Dreier's multiple roles might create legal risks (by weakening the reliability of Dreier's legal opinion) or business risks (by increasing the probability that Dreier might hide negative information about the sellers), but they also reached the reasonable conclusion that the deal adequately protected them against those risks.

Finally, as to Dreier's offer to pledge his own personal art collection as collateral in a deal in which he had previously participated only as a lawyer, this offer was concededly unusual. But based on what MacDonald and his team knew at the time, Dreier had both pecuniary and professional motives for making this unusual

13

proposal -- Dreier would make a tidy $1.65 million profit, and would help a longtime client close an important deal. Moreover, while Elliot had not previously accepted artwork as collateral, Elliot had a history of accepting unusual items as security, such as a penthouse on the Upper East Side and a landing slot at LaGuardia airport. Tr. 14. In addition, all of this occurred at the height of the financial crisis, when Wall Street was experiencing unprecedented events with regularity. In context, the Court cannot conclude that Dreier's pledge of his art collection somehow put Elliot on inquiry notice of Dreier's sophisticated fraud.

The Victim Group's second argument is that Elliot never lawfully obtained a security interest in the Artwork because the security agreement was tainted by Dreier's fraud. In support of this argument, the Victim Group notes that "[u]nder New York State law and general contract law, a forged signature renders a contract void ab initio." Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 370 (2d Cir. 2003). But that case is inapplicable, and the Victim Group's suggestion to the contrary rests on improperly conflating the contracts for the purchase of the notes, which Dreier indisputably forged, with the security agreement. The latter, a contract solely between Dreier and Elliot, contains no forgery, as Dreier validly signed it on his own behalf. See Pet., ex. B, at 11. More broadly, the Victim Group's argument proves too much, as it would have the effect of invalidating any contract signed in connection with a fraud. Indeed, by the Victim Group's logic,

14

Elliot would be precluded from enforcing the security agreement even against Dreier himself, violating the well-settled rule that "no one shall be permitted to profit by his own fraud." Bankers Trust Co. v. Litton Sys. Inc., 599 F.2d 488, 492 (2d Cir. 1979).

The Victim Group's third argument is that Heathfield cannot claim the protection of Section 853(n)(6)(B) because Elliot did not provide "value" for the security interest. The Victim Group acknowledges that the security agreement provides for Dreier to receive a $1.65 million fee, but contends that this fee is legally inadequate because it is due only upon the earlier of Elliot receiving full payment on the notes, full payment on Mr. Solow's guarantee, or delivery of the Artwork pursuant to a foreclosure, none of which occurred. But these conditions precedent concern <u>when</u> Dreier was to be paid, and leave no serious doubt as to <u>whether</u> he <b>was</b> to be paid at all. Indeed, the proposed settlement now before the Court provides for Heathfield to pay the fee to the Government <b>as</b> Dreier's successor-in-interest.

Moreover, even to the extent Elliot gave Dreier nothing more than a contingent promise of payment conditioned on events that never materialized, that would still be sufficient. The Second Circuit has held that the question of "whether a petitioner is a bona fide purchaser [under Section 853(n)(6)(B)] is a question appropriately determined by reference to state law," Pacheco v. Serendensky, 393 F.3d 348, 353 (2d Cir. 2004), and under here-relevant New York law, "a person gives value for rights if the

15

person acquires them . . . in return for any consideration sufficient to support a simple contract," N.Y. U.C.C. § 1-201(44). Black-letter contract law, in turn, provides that "when a man acts in consideration of a conditional promise, if he gets the promise he gets all that he is entitled to by his act, and if, as events turn out, the condition is not satisfied, and the promise calls for no performance, there is no failure of consideration." 3 Williston on Contracts § 7:18 (4th ed.). Because Elliot's conditional promise would be sufficient consideration to support a contract, it would constitute "value" under state law, and therefore also constitutes "value" under Section 853(n)(6)(B).

The Victim Group also objects that Dreier's $1.65 million fee is grossly inadequate "value" for the $33 million of Artwork Heathfield now seeks to recover. But the Victim Group cites no authority for the proposition that the "value" required to be given under Section 853(n)(6) must be equivalent, fair, proportional, or the like. In fact, "[i]t is an elementary and oft quoted principle" of contract law that courts "will not inquire into the adequacy of consideration as long as the consideration is otherwise valid or sufficient to support a promise." 3 Williston on Contracts § 7:21 (4th ed.). Moreover, even assuming that fair consideration were required, Elliott did not, as the Victim Group suggests, promise to pay Dreier $1.65 million for $33 million in artwork -- rather, it promised to pay $1.65 million for <u>a security interest</u> in $33 million in artwork. Receipt of that security interest, moreover, was highly

16

contingent, since the security interest stood as a third-level backstop behind notes issued by a large real estate company and a personal guarantee by its wealthy principal. "It is well established . . . that a contingent [interest] cannot be valued at its potential face amount; rather, 'it is necessary to discount it by the probability that the contingency will occur and the [interest] become real.'" In re Chase & Sanborn Corp., 904 F.2d 588, 595 (11th Cir. 1990) (quoting In re Xonics Photochemical Inc., 841 F.2d 198, 200 (7th Cir. 1988) (Posner, J.)).

The Victim Group's final argument is that Dreier's grant of the security interest should be set aside as a fraudulent conveyance. See United States v. Frykholm, 362 F.3d 413, 417 (7th Cir. 2004) (reversing district court's grant of a petition under Section 853(n)(6)(B) on the ground that the transfer in question was a fraudulent conveyance under state law). However, the relevant New York statute provides that a fraudulent conveyance may be set aside only "as against . . . a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser." N.Y. Debt. & Cred. Law § 278. Like Section 853(n)(6)(B), this provision reflects a "policy of protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme." HBE Leasing Corp. v. Frank, 48 F.3d 623, 636 (2d Cir. 1995). As explained above, the relevant circumstances here did not give Elliot reason to suspect that a fraud was afoot,

17

and Dreier's $1.65 million fee represents perfectly "fair consideration" for the security interest.

Accordingly, for the foregoing reasons, the Court finds that Heathfield and the Government have more than adequately answered the questions raised by the Victim Group and have provided an adequate factual basis for their proposed settlement. The Court therefore grants the petition and approves the settlement. Heathfield and the Government are directed to submit to the Court a fully executed copy of their proposed stipulation and order no later than one week from the date of this Opinion and Order.

SO ORDERED.

Dated: New York, NY
July 2, 2013

JED S. RAKOFF, U.S.D.J.